**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

DILAN SUMPTER,                          *

      Plaintiff,                      *

v.                                      *        Case No.: DLB-19-3270

PENNSYLVANIA NATIONAL MUTUAL            *
    CASUALTY INSURANCE CO.,
                                        *
    Defendant.
                                        *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION AND ORDER**

In this insurance coverage dispute, plaintiff Dilan Sumpter claims defendant Pennsylvania National Mutual Casualty Insurance Company ("Penn National") is obligated to pay a $1.7 million state court judgment for injuries he suffered as a result of exposure to lead-based paint while living at a Baltimore City rental property for which Penn National issued commercial general liability and commercial umbrella policies. His amended complaint includes counts for bad faith failure to settle, breach of contract, reformation, and a declaratory judgment. Penn National filed a counterclaim, seeking a declaratory judgment regarding its obligations under the policies. Sumpter filed a motion to dismiss the counterclaim, and Penn National filed a motion to dismiss Sumpter's amended complaint. ECF 21 & 31. Penn National also filed a motion to strike plaintiff's jury demand. ECF 15.

The Court finds that Sumpter fails to state a claim for bad faith failure to settle. That claim must be dismissed. The Court finds that Sumpter has stated a claim for breach of contract and reformation. Those claims will proceed. In addition, the Court will consider Sumpter's declaratory judgment claim and Penn National's counterclaim. Therefore, Penn National's motion

to dismiss the amended complaint is granted as to Count I and otherwise denied. Penn National's motion to strike the jury demand is denied. Sumpter's motion to dismiss the counterclaim is denied as well.

## I.    Background

Dilan Sumpter sustained injuries due to lead-based paint exposure between September 5, 1996 and August 1, 1997. Am. Compl. ¶¶ 2, 61, ECF 20. The exposure occurred at a residential rental property owned and operated by City Homes, Inc. ("City Homes") and Barry Mankowitz ("Mankowitz"). *Id.* ¶¶ 2–3, 25. Starting in 1991 and continuing until 1997, City Homes and Mankowitz purchased from Penn National commercial general liability ("CGL" or "general liability") and commercial umbrella insurance policies for their residential rental properties in Baltimore. *Id.* ¶ 3. The one-year policy period for each policy began on October 3 of the respective year. The 1995–1996 and 1996–1997 CGL and umbrella insurance policies provided coverage from October 3, 1995 to October 3, 1996 and October 3, 1996 to August 1, 1997, respectively. *Id.* ¶¶ 39 & 55; Def.'s Mem. 4 & 29 n.26, ECF 31-1 (explaining the insureds and insurer agreed Penn National's lead paint coverage would conclude August 1, 1997). Together, they spanned the period in which Sumpter claimed injuries, September 5, 1996 to August 1, 1997. The policies covered claims for injuries due to lead-based paint exposure. Am. Compl. ¶¶ 27, 39–40; CGL Policy § I(A) (coverage for bodily injury), ECF 31-8; Umbrella Policy § I(1) (coverage for bodily injury), ECF 31-9.[1]

---

[1] Defendant attached the 1995–1996 policies to its motion and noted that they are "virtually identical" to the 1996–1997 policies. Def.'s Mem. 20 n.22, ECF 31-1. The policy provisions discussed in this memorandum opinion are identical unless otherwise noted. This Court "may consider the complaint itself and any documents that are attached to it," as well as any "document that the defendant attaches to its motion to dismiss if the document was integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." *CACI Int'l v. St. Paul Fire & Marine Ins. Co.*, 566 F.3d 150, 154 (4th Cir. 2009) (citations omitted); *see Paris v.*

The CGL policy provides that Penn National "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' . . . to which this insurance applies" and that it "will have the right and duty to defend any 'suit' seeking those damages." CGL Policy § I(A)(1)(a).   It also provides that Penn National "may at [its] discretion investigate any 'occurrence' and settle any claim or 'suit' that may result." *Id.*   The policy provides that Penn National's "right and duty to defend end when [Penn National has] used up the applicable limit of insurance in the payment of judgments or settlements." *Id.* § I(A)(1)(a)(2).   It states that "[a] person or organization may sue [Penn National] to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial." *Id.* § IV(3).   It also states that Penn National "will not be liable for damages that are not payable under the terms of this Coverage Part or that are in excess of the applicable limit of insurance."   *Id.*

The umbrella policy provides excess insurance coverage for claims covered under the CGL policy.  Am. Compl. ¶ 40.  It provides that Penn National "will pay on behalf of the insured the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes legally

---

*Masco Corp.*, No. PWG-18-2434, 2020 WL 886173, at *3 (D. Md. Feb. 24, 2020) (quoting *CACI Int'l*); Fed. R. Civ. P. 10(c).  Plaintiff incorrectly argues that the Court should limit its review to the allegations in his amended complaint.  Pl.'s Opp'n 1 & 24.  He does not, however, challenge the authenticity of the policies.  Moreover, defendant notes:

> The policy forms for the policies[] were filed with the Court and/or provided by the Plaintiff in *Johnson v. Pennsylvania National Mutual Ins. Co.,* et al, 1:19-cv-02190-CCB. . . . City Homes, Inc., City Homes, LLP, and Barry Mankowitz (all parties to the *Johnson* action) never contradicted that these were the policies forms in their answers in *Johnson*. (Counsel for Barry Mankowitz in *Johnson* is the Plaintiff's counsel in the instant case).

Def.'s Mem 5 n.11.  The Court also may take judicial notice of the state court dockets and the bankruptcy filings, which are matters of public record.  *See* Fed. R. Evid. 201(b)(2).  The Court will not consider defendant's other exhibits, which are not integral to the complaint.  *See CACI Int'l*, 566 F.3d at 154.

obligated to pay as damages because of . . . Bodily Injury . . . to which this insurance applies."
Umbrella Policy § I(1). It also provides that Penn National

> will have the right and duty to defend any "suit" for damages which are payable
> under Coverage A or B . . . but which are not payable by a policy of "underlying
> insurance", or any other available insurance, because:
>
> (1)    Such damages are not covered; or
>
> (2)    The "underlying insurance" has been exhausted by the payment of claims.

*Id.* § I(2). The policy states that Penn National "may investigate and settle any claim or 'suit' . . .
at [its] discretion" and that its "right and duty . . . ends when [it has] used up the 'applicable limit
of insurance' in the payment of judgements or settlements." *Id.* The "applicable limit of
insurance" is "the maximum amount [Penn National] will pay as damages in accordance with
SECTION III – Limits of Insurance." *Id.* § V(2). The umbrella policy grants Penn National the
right to appeal "a judgement which exceeds the 'applicable underlying limit.'" *Id.* § IV(1)(a). It
states that Penn National may participate "in the investigation, settlement and defense of all claims
and 'suits'" for which it "believe[s] that a claim may exceed the 'underlying insurance.'" *Id.*
§ IV(5). It states that "[a] person or organization may sue [Penn National] to recover on an agreed
settlement or on a final judgement against an insured obtained after an actual trial." *Id.* § IV(8).
It also states that Penn National "will not be liable for damages . . . that (a) [a]re not payable under
the terms of this insurance; or (b) [a]re in excess of the 'applicable limit of insurance.'" *Id.*

The CGL policies provided coverage of $1 million each year, and the umbrella policies
provided excess coverage of $10 million each year. Am. Compl. ¶¶ 10, 35–36, 41–43. Every
CGL policy that Penn National issued to City Homes and Mankowitz from 1991 through 1997,
with the exception of the 1995–1996 policy, included an endorsement that stated the limits were
per property. *Id.* ¶ 37 (alleging Form CG 2504 11/85, which stated coverage limits were per
property, was part of the four policies preceding the 1995-1996 policy); *id.* ¶ 53 (alleging a

substantially equivalent form was part of the 1996–1997 policy).  The 1995–1996 policy did not contain Form CG 2504 11/85, the per property endorsement.  *Id.* ¶ 46.

The crux of the dispute is how the omission of the per property endorsement affects the limits of liability for the 1995–1996 policies.  Penn National argues that the $1 million in coverage under the CGL policy and the $10 million in coverage under the umbrella policy is the total coverage available for all of the insured properties.  Def.'s Mem. 3–4; *see* Am. Compl. ¶¶ 67–68.  This amounts to a total of $11 million in personal liability insurance for approximately 278 City Homes properties.  Am. Compl. ¶¶ 10, 30, 67–68.  Sumpter insists the policy limits were per property, as they had been in the prior policy years and in the subsequent policy year.  *Id.* ¶¶ 35–36, 41–43, 46–47.  Sumpter contends that the $11 million in coverage under the 1995–1996 policies applies to the property where he was exposed to lead-based paint and that every other City Homes property has its own $11 million in coverage.  *Id.* ¶¶ 10 & 43.

Sumpter claims the omission of the per property endorsement from the 1995–1996 CGL policy was nothing more than a clerical error.  *Id.*  Sumpter alleges that on September 29, 1995, shortly before the renewal of the policies, City Homes' insurance broker informed Mankowitz of the erroneous omission of the per property endorsement from the 1995-1996 CGL policy and said it would be remedied, although it never was.  *Id.* ¶¶ 47–48.  The broker wrote:

> Enclosed please find your renewal policy for 94-95 and 95-96. All endorsements which relate to your 94-95 policy have also been included.  Several errors were found on the 95-6 policy, which are listed below.  Endorsements will be issued to correct these problems.
>
> […]
>
> #2: Add the following liability forms or advise why they were not included: … CG2504 11/85

*Id.* ¶ 47.  Based on this information, Sumpter alleges it was intended "that an endorsement be issued to correct the clerical error of leaving CG2504 11/85 off of the declarations page for City

Homes' 1995-1996 CGL insurance." *Id.* ¶ 48.  According to Sumpter, the premium for the 1995–1996 policy period "was substantially the same as the premiums [City Homes] paid for its insurance policies prior and subsequent to the 1995-1996 policy period." *Id.* ¶ 50.

City Homes filed for Chapter 11 bankruptcy in 2013.  Am. Compl. ¶ 56.  On April 13, 2017, its liabilities were discharged in bankruptcy, except to the extent insurance coverage was available. *Id.* ¶¶ 56–58.  Mankowitz's liabilities were not discharged. *Id.* ¶ 59.  City Homes and Mankowitz assigned to Sumpter their right to sue Penn National. *Id.* ¶ 14.

On May 1, 2017, Sumpter filed suit in state court against City Homes and Mankowitz to recover for his lead-based paint injuries.  Penn National defended its insureds pursuant to a reservation of rights. *Id.* ¶¶ 1, 4, 60.

On March 13, 2019, Penn National informed City Homes and Mankowitz that the 1995–1996 CGL policy had been exhausted.  Am. Compl. ¶ 65.  Penn National took the position that Form CG2504 11/85 is not part of the 1995–1996 CGL insurance policy and that the aggregate limit of primary insurance for all of City Homes properties insured under the 1995–1996 commercial general liability insurance policy was $1 million. *Id.*  Penn National also informed its insureds that $4,702,726.46 remained on the 1995–1996 commercial umbrella policy. *Id.* ¶ 66.

On May 24, 2019, Sumpter sent Penn National a $400,000 settlement demand. *Id.* ¶¶ 5 & 76.  Penn National refused to settle even though, by plaintiff's calculation, the demand was within all remaining policy limits. *Id.* ¶¶ 6–7.  Penn National agrees that the demand was within the 1995–1996 commercial umbrella policy limit. *Id.* ¶ 88.

On June 4, 2019, the jury returned a plaintiff's verdict for $1,725,936. *Id.* ¶ 8; State Ct. Docket.  On June 6, 2019, the state court entered an order of judgment, which was recorded on

June 10, 2019.  State Ct. Docket.  On June 17, 2019, defendants filed a motion for judgment notwithstanding the verdict or, alternatively, a motion for a new trial.  *Id*.

In a June 21, 2019 letter, Penn National informed its insureds that $1,005,046.85 remained under the 1995–1996 umbrella policy.  Am. Compl. ¶ 88.  In an August 5, 2019 letter, Penn National informed its insureds that the 1995–1996 primary and umbrella policies had been exhausted.  *Id.* ¶ 97.  On August 22, 2019, the state court denied post-judgment motions.  State Ct. Docket.  Penn National refused to provide coverage for the judgment, insisting the limits of liability under the 1995–1996 policies had been exhausted.  Am. Compl. ¶¶ 11–12.  Penn National did not notify Sumpter about the remaining limits on the 1996–1997 policies.  *Id.* ¶ 13.

Sumpter filed suit against Penn National in this Court on November 13, 2019.  ECF 1.  In his complaint, he asserted a claim of bad faith failure to settle within the 1995–1996 and 1996–1997 CGL and commercial umbrella policy limits (Count I); a claim for breach of contract based on defendant's alleged breach of the 1995–1996 and 1996–1997 CGL and commercial umbrella policies (Count II); a claim pursuant to Md. Code Ann., Ins. § 19-102(b)(2) (Count III); a claim for reformation of the 1995–1996 CGL policy to include Form CG 2504 11/85, based on mutual mistake (Count IV); and a claim for a declaratory judgment that Form CG 2504 11/85 applied to the 1995–1996 CGL policy (Count V).

On January 21, 2020, Penn National filed a motion to strike jury demand, ECF 15, a motion to dismiss, ECF 16, and a counterclaim, ECF 17.  In the counterclaim, Penn National sought a declaratory judgment that "Penn National is contractually obligated to pay no more than that the portion of Sumpter's final judgment which represents Penn National's pro-rata time on the risk" and stating "the correct percentage of Sumpter's judgment that is payable by Penn National." Countercl. ¶¶ 23–25.

On February 25, 2020, Sumpter filed an amended complaint.  ECF 20.  He asserts the same bad faith (Count I), breach of contract (Count II), reformation (Count III), and declaratory judgment (Count IV) claims that he asserted in his original complaint.  He eliminated his claim under the Maryland Insurance Code.

On February 25, 2020, Sumpter also filed a motion to dismiss the counterclaim, ECF 21, and a document labeled as a response in opposition to Penn National's motion to dismiss and motion to strike jury demand, ECF 22.  In the latter document, Sumpter informed the Court that the parties agreed the motion to dismiss was moot in light of the amended complaint, although Penn National could raise the same arguments in response to the amended complaint, and the motion to strike jury demand should be stayed pending Penn National's response to the amended complaint.  *Id.*  The parties fully briefed the motion to dismiss the counterclaim.  ECF 21-1, 32 & 35.

On May 22, 2020, Penn National filed a motion to dismiss the amended complaint.  ECF 31.  The parties fully briefed that motion as well.  ECF 31-1, 36 & 37.  Penn National's response to the amended complaint ended the stay on the motion to strike the jury demand, but Sumpter has not filed any additional response to it.  A hearing is not necessary.  *See* Loc. R. 105.6.

## II.     Motion to Dismiss

### A.   *Standard of Review*

Penn National filed its motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Def.'s Mem. 11.[2]  Sumpter does not identify the applicable grounds for dismissal in his

---

[2] Penn National also argues that plaintiff's claim for bad faith failure to settle under the 1996–1997 policies is subject to dismissal under Rule 12(b)(1) as not ripe, because Sumpter fails to allege that the limits under the 1996–1997 policies were exhausted.  Def.'s Mem. 13.

When a defendant moves to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction, asserting a facial challenge that "a complaint simply

motion to dismiss defendant's counterclaim, but he argues that the pleading should be dismissed for failure to state a claim. Pl.'s Mem. 2. A Rule 12(b)(6) motion challenges "the legal sufficiency of a complaint" on the grounds that, "even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law 'to state a claim upon which relief can be granted.'" *Thomas-Lawson v. Koons Ford of Balt., Inc.*, No. SAG-19-3031, 2020 WL 1675990, at *2 (D. Md. Apr. 6, 2020) (citing *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017)); *see* Fed. R. Civ. P. 12(b)(6). A complaint is sufficient if it "contain[s] 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Cooke v. Caliber Home Loans, Inc.*, No. PWG-18-3701, 2020 WL 1434105, at *3 (D. Md. Mar. 24, 2020) (quoting Fed. R. Civ. P. 8(a)(2)). When resolving a motion to dismiss, the Court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007))). Rather, the Court "accept[s] as true all of the factual allegations contained in the complaint and draw[s] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). If, however, an affirmative defense such as laches "'clearly appears on the face of the complaint,' . . . the Court may rule on that defense when considering a motion to dismiss." *Skibicki v. Fairmont Plaza*, No. PWG-17-1366, 2018 WL 3862252, at *2 (D. Md. Aug. 14, 2018) (quoting *Kalos v. Centennial Sur. Assocs.*, No. CCB-12-

---

fails to allege facts upon which subject matter jurisdiction can be based," as Defendant does here, "the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a 12(b)(6) consideration."

*Criscione v. U.S. Nuclear Regulatory Comm'n*, No. PWG-19-2087, 2020 WL 5912567, at *4 (D. Md. Oct. 6, 2020) (quoting *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982)). Thus, the same standard applies. *See id.*

1532, 2012 WL 6210117, at *2 (D. Md. Dec. 12, 2012)); *see Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000).

    *B.  Discussion*

       *1.  Bad Faith Failure to Settle*

    When an insurer undertakes to defend its insured against a claim, "[the] insurer does not have an absolute duty to settle [the] claim within policy limits," but "it may not refuse to do so in bad faith." *Allstate Ins. Co. v. Campbell*, 639 A.2d 652, 659 (Md. 1994). "[A] bad faith failure to settle the claim within policy limits . . . gives rise . . . to a tort action" under Maryland law.[3] *Mesmer v. Md. Auto. Ins. Fund*, 725 A.2d 1053, 1061 (Md. 1999); *see Johnson v. Penn. Nat'l Mut. Cas. Ins. Co.*, 447 F. Supp. 3d 372, 379–80 (D. Md. 2020) (quoting *Mesmer*).

> The failure to settle may be in bad faith if it is not "an informed judgment based on honesty and diligence." Factors that might show bad faith include: the likelihood of a verdict in excess of policy limits; lack of proper investigation or evaluation of the accident or the plaintiff's disability; failure of the insurer to inform the insured of a compromise offer within or near the policy limits; pressure by the insurer on the insured to contribute to the settlement within policy limits; and "actions which demonstrate a greater concern for the insurer's monetary interests than the financial risk attendant to the insured's predicament."

*Johnson*, 447 F. Supp. 3d at 379–80 (quoting *State Farm Mut. Auto. Ins. Co. v. White*, 236 A.2d 269, 273 (Md. 1967)) (internal citation omitted).

    The action accrues upon "the entry of a judgment against the insured in excess of policy limits." *Mesmer*, 725 A.2d at 1063 (quoting *Campbell*, 639 A.2d at 659). The insurer may "recover the amount of an excess judgment." *Id.* at 1064. That is, "the measure of damages in a bad faith failure to settle case is the amount by which the bonafide [sic] judgment rendered in the

---

[3] The parties agree that Maryland law applies to their claims. Def.'s Mem. 15, 20 & 27; Pl.'s Opp'n 9; Pl.'s Mem. 3; Def.'s Opp'n 2.

underlying action exceeds the amount of insurance coverage." *Kremen v. Md. Auto. Ins. Fund*, 770 A.2d 170, 177 (Md. 2001).

Penn National argues plaintiff fails to state a claim for bad faith because he "has not alleged that the amount of the Judgment is in excess of the applicable policy limits" and "exhaust[ion] by payments to other claimants . . . does not establish a claim for bad faith." Def.'s Mem. 1. Defendant also argues "Sumpter cannot, as a matter of law, establish that . . . City Homes [and Mankowitz] have personal liability exposure for the Judgment" and, even if he were able to state a claim, "this Court should stay all proceedings on this Count because it would be advisable to have a determination, among other things, of the state court appeal." *Id.* at 2.

Sumpter counters that "[t]he Amended Complaint easily meets the pleading standard sufficient to state a claim for bad faith" by alleging that "the judgment against the Insureds exceeds the applicable policy limits" and "the Insureds are personally liable for the Underlying Judgment." Pl.'s Opp'n 8–9, 10, 12. He contends the claim should not be stayed because "[a]ll of the elements necessary to establish the tort of bad faith have taken place, so the issue is now fit for review." *Id.* at 20.

In the Amended Complaint, Sumpter makes the following allegations in support of his bad faith claim. He alleges he made a settlement demand for $400,000, which was below the limits of liability of the policies, and that there were sufficient funds under the 1995–1996 policies to cover the demand, but Penn National refused to settle. Am. Compl. ¶¶ 88, 101–09. In June 2019, Sumpter obtained a judgment for $1,725,936, which exceeded the $1 million CGL policy limits. *Id.* ¶ 8. At the time of the judgment, funds were still available under the 1995–1996 umbrella policy to cover the judgment. *Id.* ¶ 88. Rather than pay the judgment, Penn National informed its insureds that the coverage limits had been exhausted under both 1995–1996 policies. *Id.* ¶¶ 97–

98.  He alleges "[t]he amount of the verdict against City Homes and Mankowitz is in excess of the policy limits that Penn National contends are available to them under the 1995-1996 and 1996-1997 policy periods."  Am. Compl. ¶ 95; *see id.* ¶ 111 (same).  He contradicts that threadbare allegation when he claims Penn National "never provided City Homes or Mankowitz with any information regarding the limits of coverage remaining under either of the 1996-1997 insurance policies."  *Id.* ¶ 13.

Sumpter claims Penn National's failure to accept his settlement demand was in bad faith because it failed to make "an informed judgment and . . . an honest and diligent assessment of the Underlying Lawsuit."  Am. Compl. ¶ 106.  Specifically, Sumpter alleges it was likely he would obtain a verdict in excess of his $400,000 settlement demand.  *Id.*  Moreover, he alleges that Penn National should have known it was likely his verdict would be greater than his settlement demand. *Id.* ¶¶ 77–83, 106.  He claims his "attorneys presented Penn National with sufficient evidence— factual, medical, and legal—that Penn National's insureds, City Homes and Mankowitz, would face a substantial risk that a judgment would be entered against them in excess of the $400,000 settlement demand."  *Id.* ¶ 78.  In addition, he claims Penn National should have known about the likelihood of a verdict in excess of $400,000 based on "Penn National's extensive experience with lead-based paint personal injury lawsuits in the Circuit Court for Baltimore City," outcomes in similar cases, the strength of the evidence against City Homes and Mankowitz, and the fact that his "economic damages alone far exceeded $400,000."  *Id.* ¶¶ 79–82.

Sumpter also alleges Penn National acted in bad faith because its "actions 'demonstrate[d] a greater concern for the insurer's monetary interests than the financial risk attendant to the insured's predicament.'"  Am. Compl. ¶ 108 (quoting *White*, 236 A.2d at 273).  In this regard, Sumpter alleges Penn National acted in bad faith by reaching the "entirely frivolous" conclusion

that there were no available limits to settle the suit because Form CG2504 11/85, the per property endorsement, was not part of the 1995–1996 CGL insurance policy. *Id.* ¶ 93. He claims "[a] wealth of evidence indicates that Form CG2504 11/85 was, in fact, a part of City Homes' 1995–1996 CGL insurance policy." *Id.* ¶ 92.

The Court accepts Sumpter's well-pleaded allegations as true and finds he has failed to state a claim for bad faith failure to settle under the 1995–1996 and 1996–1997 CGL and umbrella policies. For starters, it is unclear which policy or policies Sumpter alleges are implicated by the bad faith claim. Insofar as he brings his claim under the 1995–1996 policies, it is unclear whether he alleges the verdict of $1.7 million was in excess of the CGL policy's $1 million limit *and* the umbrella policy's $10 million limit. It is also unclear whether the alleged excess verdict is based on defendant's position that the per property endorsement was not part of the policies or Sumpter's position that it was. Indeed, Sumpter does not allege it is his position that there was no coverage available under the policies. Rather, he alleges it is Penn National's position there was no coverage available. As it turns out, there does appear to be coverage available for the judgment under the 1996–1997 policies, which, if true, would defeat a bad faith claim as to those policies. *See* Def.s' Mem. 14 n.17; Def.'s Reply 4 nn.4–5.

The lack of clarity in the Amended Complaint continues. It is unclear whether Sumpter alleges there was an excess verdict because the judgment exceeded the CGL or umbrella policy's limits of liability or because it exceeded the funds available under the respective policies. If it is the latter, then it is unclear whether the funds available are measured at the time the demand was made, when judgment was entered, or after the ruling on post-judgment motions.

Both parties refer to Judge Blake's opinion in *Johnson v. Pennsylvania National Mutual Casualty Insurance Co.*, 447 F. Supp. 3d 372 (D. Md. 2020), in which the Court dismissed the

plaintiff's bad faith claim against Penn National.  *Johnson* involves the identical insurance policies and a similar dispute over coverage for a judgment arising from lead-based paint exposure at properties that City Homes and Mankowitz owned.  In *Johnson*, 447 F. Supp. 3d 372, Judge Blake concluded that Johnson could not state a claim for bad faith failure to settle when he alleged that Penn National had exhausted the policies by paying other claimants before the entry of final judgment in his case.  Judge Blake found there was no excess verdict in *Johnson* because, "[a]t the time of the trial judgment, . . . there was enough money remaining in the policy to pay it. . . . [T]he money was exhausted paying other claimants against the City Homes defendants [i.e., City Homes and Mankowitz] *after* the judgment." *Johnson*, 447 F. Supp. 3d at 380 n.10 (emphasis added). The Court concluded that plaintiff failed to allege sufficiently that Penn National's payments to other claimants "demonstrate[d] a greater concern for [its] monetary interests than the financial risk attendant to the insured's predicament." *Id.* at 380 (quoting *White*, 236 A.2d at 273) (holding that the insurer's decision "to exhaust the policy limit by settling with other claimants or potential claimants and/or paying other judgments against the City Homes defendants, instead of settling with or paying Johnson," did not demonstrate bad faith).

The allegations underpinning the dismissed bad faith claim in *Johnson* differ markedly from the bad faith allegations here.  And the reasons for dismissal of the bad faith claims are different.  Here, unlike in *Johnson*, the plaintiff has not made clear the bad faith claim implicated the umbrella policy.  *Compare* Am. Compl. ¶ 109, *with Johnson*, 447 F. Supp. 3d at 379 n.8.  In *Johnson*, unlike here, it was clear there was no excess verdict based on the allegations in the complaint.  Further, unlike Johnson, Sumpter does not predicate his bad faith claim on the erosion of the policy limits to pay other claims.  While this distinction cuts in Sumpter's favor, he still has not adequately pled a bad faith claim because he fails to allege sufficiently that he obtained a

verdict in excess of the policy limits.  *See Johnson*, 447 F. Supp. 3d at 379–80; *Mesmer*, 725 A.2d at 1063–64; *Kremen*, 770 A.2d at 177.

Sumpter's bad faith claim is predicated largely on Penn National's position that the per property endorsement was not part of the 1995–1996 policies.  Am. Compl. ¶¶ 92–95.  That central issue will be decided by the reformation claim.  Thus, even if the bad faith claim had been properly pled, the Court would have stayed the claim because it would be more efficient to decide the other pending claims first.  Should discovery regarding the reformation claim, or its ultimate resolution, provide plaintiff with sufficient facts to state a claim for bad faith failure to settle, the Court will entertain a motion to amend at that time.  Because Sumpter has failed to state a claim for bad faith failure to settle, Count I is dismissed without prejudice.[4]

---

[4] Because this claim is subject to dismissal, the Court need not reach defendant's arguments that the bankruptcy plan precludes liability for bad faith failure to settle and that the claim should be stayed.  *See* Def.'s Mem. 14–15, 18–19.  Penn National also argues Sumpter's claim for bad faith failure to settle under the 1996–1997 policies is not ripe because he "fails to allege that the Judgment in the Lead Paint Case has subjected Penn National's insured to a judgment in excess of policy limits."  *Id.* at 12.  It contends more broadly that Sumpter's claims "are not ripe because they are predicated, among other things, on (1) the Judgment at issue, which is currently on appeal; and (2) the certainty of the amount of available coverage (which, as indicated in the counterclaim, is in dispute)."  *Id.*  Ripeness, a jurisdictional requirement set by Article III of the Constitution, "addresses when a party may bring a suit."  *Am. Acad. of Pediatrics v. Food & Drug Admin.*, 379 F. Supp. 3d 461, 474 (D. Md. 2019) (citing *South Carolina v. United States*, 912 F.3d 720, 730 (4th Cir. 2019)); *see* U.S. Const. art. III, § 2.  A case is ripe if "the fitness of the issues for judicial decision" outweighs "the hardship to the parties of withholding court consideration."  *Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006) (quoting *Franks v. Ross*, 313 F.3d 184, 194 (4th Cir. 2002)).  "A case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties."  *Id.*  Here, there is no future uncertainty.  Either funds were available or they had been exhausted under the 1996–1997 policies when Sumpter's judgment became final.  Sumpter's failure to state whether the policy limits had been exhausted is simply a pleading deficiency.  Additionally, defendant has not provided a basis for concluding that the ongoing state court litigation deprives this Court of jurisdiction.

## 2. Breach of Contract

To state a claim for breach of contract, Sumpter must allege that "the defendant owed [its insured] a contractual obligation and that the defendant breached that obligation." *Johnson*, 447 F. Supp. 2d at 378–79 (quoting *Taylor v. NationsBank, N.A.*, 776 A.2d 645, 651 (Md. 2001)). If plaintiff's allegations of contractual obligations conflict with the insurance policy, the policy prevails. *See Osowiecki v. Ocwen Loan Servicing, LLC*, No. GLR-19-819, 2020 WL 779509, at *2 (D. Md. Feb. 18, 2020) (citing *Fare Deals Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 683 (D. Md. 2001)). The court considers the insurance policy's plain language and generally assigns "the words and phrases . . . their ordinary and accepted meanings as defined by what a reasonably prudent lay person would understand them to mean." *Bethany Boardwalk Grp. LLC v. Everest Sec. Ins. Co.*, No. ELH-18-3918, --- F. Supp. 3d ----, 2020 WL 1063060, at *7 (D. Md. Mar. 5, 2020) (quoting *Universal Underwriters Ins. Co. v. Lowe*, 761 A.2d 997, 1005 (Md. Ct. Spec. App. 2000)).

Plaintiff presents two scenarios under which Penn National allegedly breached its policies.[5] Under the first, he claims Penn National was obligated to pay judgments against its insureds within policy limits, plaintiff's judgment was within policy limits and funds were available, and Penn National failed to pay the judgment. Am. Compl. ¶ 118. Alternatively, under the second scenario, plaintiff claims Penn National breached the contract by "fail[ing] to protect the funds necessary to provide coverage for Plaintiff's judgment," such that the judgment exceeded the policy limits. *Id.* ¶ 119.[6]

---

[5] Sumpter alleges that Penn National breached the "CGL and commercial umbrella insurance policies." *See* Am. Compl. ¶¶ 114–18. Therefore, the Court considers the sufficiency of this claim as to the 1995–1996 and 1996–1997 CGL and commercial umbrella insurance policies.

[6] Sumpter argues that the allegations supporting defendant's bad faith failure to settle also are sufficient to state a claim for breach of contract. Pl.'s Opp'n 24. He insists that "if an insurance

The Court's analysis begins with the second scenario, which Judge Blake addressed in *Johnson.* There, as here, the plaintiff alleged the umbrella policy was exhausted. There, as here, the umbrella policy "obligate[d] Penn National to 'pay on behalf of the insured the "ultimate net loss" in excess of the "applicable underlying limit" which the insured becomes legally obligated to pay as damages . . . .'" *Johnson*, 447 F. Supp. 3d at 379 (quoting Umbrella Policy § I(1)). There, as here, the policy granted Penn National "the right to 'investigate and settle any claim' which is payable under the umbrella policy," as well as to "appeal a judgment which exceeds the applicable underlying limit." *Id.* (quoting Umbrella Policy §§ I(2)(c), IV(1)). Johnson alleged that Penn National "breached the umbrella policy by not paying [his] judgment against the City Homes defendants . . . before the umbrella policy had been exhausted, and by failing 'to protect the funds necessary to provide coverage for [Johnson's] judgment.'" *Id.*

Judge Blake concluded that Johnson failed to state a claim for breach of contract. She reasoned that, "[b]y the time Johnson's judgment amount became certain" and Penn National's legal obligation to pay accrued, Penn National "had already paid up to the applicable limit of insurance, and no longer had a contractual obligation to pay Johnson's judgment against the City Homes defendants." *Id.* In addition, "Johnson ha[d] not sufficiently alleged that Penn National had an obligation to preserve the money under the umbrella policy to pay Johnson's judgment even before Penn National had an actual obligation to pay," because Penn National's "right to settle

---

company acts in bad faith in exercising its discretion to settle with some claimants and not others," as he contends Penn National has, "it has breached its implied contractual obligation of good faith and fair dealing, and thus breached the contract." *Id.* But, "a liability insurer's undertaking to defend against a claim and its bad faith failure to settle the claim within policy limits . . . gives rise only to [the] tort action" of bad faith failure to settle under Maryland law; it is the "insurer's breach of the insurance contract by erroneously disclaiming coverage" that gives rise to liability in contract. *Mesmer*, 725 A.2d at 1061; *see also Johnson*, 447 F. Supp. 3d at 379–80.

claims gave it the right to settle other claims between when Johnson gained the ability to execute on his judgment and when the judgment amount became certain." *Id.*

The Court agrees that, once the insurer exhausted the applicable limits by paying other claims, it no longer had a contractual obligation to pay the plaintiff's judgment. *See id.*; CGL Policy § I(A)(1)(a)(2). The plain language of the insurance policies does not impose an obligation on Penn National to preserve funds to pay one judgment instead of paying other claims or judgments. Like Johnson, Sumpter "has not sufficiently alleged that Penn National had an obligation to preserve the money under [any of the policies] even before Penn National had an actual obligation to pay," because Penn National had "the right to settle other claims" before Sumpter's judgment became final. *See Johnson*, 447 F. Supp. 3d at 379. Accordingly, Sumpter has not stated a claim for breach of contract based on Penn National's failure to preserve funds to cover his judgment. *See id.*

Under the first breach of contract scenario, in which funds are available and Penn National has refused to pay the judgment, Sumpter has stated a claim for breach of contract. The policies obligate Penn National to "pay those sums that the insured becomes legally obligated to pay." CGL Policy § I(A)(1)(a); *see* Umbrella Policy §§ I(1). Indeed, Sumpter alleges the insurance policies "obligated Penn National to pay any sums its insured became 'legally obligated' to pay as a result of an 'occurrence.'" Am. Compl. ¶ 116. Sumpter further alleges the "judgment that Plaintiff obtained against City Homes and Mankowitz constitutes a sum that City Homes and Mankowitz became 'legally obligated' to pay as a result of an 'occurrence.'" *Id.* ¶ 117. Finally, Sumpter alleges "Penn National failed to pay the judgment Plaintiff obtained against City Homes and Mankowitz despite the availability of insurance policy limits from which the judgment could

be satisfied." *Id.* ¶ 118. The Court accepts Sumpter's well-pleaded allegations as true, draws all reasonable inferences in his favor, and finds plaintiff has stated a claim for breach of contract.

The Court acknowledges it reached a different conclusion in *Johnson*. The allegations with respect to this breach of contract theory differ from those before Judge Blake in *Johnson*. As discussed, Johnson alleged Penn National exhausted the insurance funds instead of paying his judgment. Under this breach of contract theory, Sumpter alleges Penn National had not yet exhausted the funds. In addition, Johnson alleged in his proposed second amended complaint that "Penn National contested the amount of the judgment" and that "the judgment was subsequently reduced . . . after the umbrella policy became exhausted . . . ." *Johnson*, 447 F. Supp. 3d at 379 (quoting Johnson's proposed second amended complaint). No such allegations are made here. Moreover, Johnson filed a motion for reconsideration of the dismissal of his breach of contract claim, which Judge Blake denied "without prejudice to renewal if appropriate, at the conclusion of appellate proceedings in the underlying state court case." *See* ECF 49 in *Johnson* (staying case pending state court appeal).

Penn National has not shown that the post-judgment filings in Sumpter's state court litigation prevent plaintiff from stating a claim for breach of contract. Even if the judgment were not certain until the state court resolved Penn National's motion for judgment notwithstanding the verdict, plaintiff's allegation is simply that when he obtained a judgment, defendant was obligated to pay it and funds were available under the policies to cover it. Am. Compl. ¶¶ 117–18. Additionally, Sumpter alleges Penn National informed its insured on August 5, 2019 that the 1995–1996 primary and umbrella policies had been exhausted. *Id.* ¶ 97. Thus, just two weeks before the state court denied post-judgment motions, only $11 million had been paid under policies that provided coverage for approximately 278 properties. Sumpter alleges the policies provided $11

million in coverage for each property, not for all properties.  On the allegations before the Court, plaintiff has sufficiently alleged there were funds available when Penn National's obligation to pay accrued.

Penn National argues it has no obligation to pay the judgment because it is pending appeal. Def.'s Mem. 21.  It is true the umbrella policies provide that Penn National may challenge the judgment through appeal, which Penn National has done.  Umbrella Policy § IV(1)(a).  But the appeal does not stay enforcement of that judgment as a matter of course.  Rather,

> an appellant may stay the enforcement of any other civil judgment from which an appeal is taken by filing with the clerk of the lower court a supersedeas bond under Rule 8-423, alternative security as prescribed by Rule 1-402 (e), or other security as provided in Rule 8-424. The bond or other security may be filed at any time before satisfaction of the judgment, but enforcement shall be stayed only from the time the security is filed.

Md. Rule 8-422(a)(1).  Indeed, the umbrella policy states that Penn National will pay "the cost of appeal bonds" in "any claim or 'suit' [it] defend[s]" and will "pay all costs of the appeal" if it elects to appeal a judgment.  Umbrella Policy §§ I(2)(e)(2), IV(1).  Penn National does not suggest that it has posted a bond.  Penn National argues instead that an obligation to pay before the appeal is resolved would render the appeal provision meaningless.  Def.'s Mem. 21.  The appeal provision is not meaningless because Rule 8-422(a)(1) enables Penn National to delay payment of the judgment during the pendency of the appeal.  Accordingly, Sumpter sufficiently alleged Penn National is obligated to pay the judgment, even though the appeal is pending.

Penn National's motion to dismiss is denied as to Sumpter's claim for breach of contract.

### 3. *Reformation Based on Mutual Mistake and Declaratory Judgment*

In Count III, plaintiff asks the Court to reform the 1995–1996 CGL policy because Penn National and the insureds "intended that the policy would provide the same level of coverage, or a greater level of coverage, as in prior and subsequent years."  Am. Compl. ¶ 125.  Sumpter seeks

similar relief in Count IV through a declaratory judgment that "Form CG 2504 11/85 was applicable to City Homes' 1995-1996 CGL insurance policy." *Id.* at 21.

This Court may reform a contract under Maryland law if there has been a mutual mistake. *Johnson*, 447 F. Supp. 3d at 381. A mutual mistake occurs when "there has been a meeting of the minds—and an agreement actually entered into, but the instrument, in its written form, does not express what was intended by the parties thereto." *Id.* (quoting *Kishter v. Seven Courts Cmty. Ass'n, Inc.*, 626 A.2d 993, 996 (Md. Ct. Spec. App. 1993)).

This Court may issue a declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201. It may do so "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Championship Tournaments, LLC v. United States Youth Soccer Ass'n, Inc.*, No. SAG-18-2580, 2019 WL 6895876, at *2 (D. Md. Dec. 18, 2019) (citing *Aetna Cas. & Sur. Co. v. Quarles*, 92 F.2d 321, 325 (4th Cir. 1937)).

Defendant sets forth three grounds for dismissal of these claims: the doctrine of laches bars both claims, City Homes ratified the policy terms or waived its claims for reformation and a declaratory judgment, and the bankruptcy plan bars both claims. Def.'s Mem. 24, 29, 31. Penn National also argues that plaintiff fails to meet the heightened standard for pleading mistake as a basis for contract reformation. *Id.* at 33. This Court addressed the same arguments regarding the equitable claims in *Johnson*. The Court now will address the arguments in the context of this case.

a. *Heightened Pleading Standard*

Plaintiff seeks reformation based on mutual mistake and therefore must meet the heightened pleading standard of Rule 9(b). Pursuant to Rule 9(b), a party "alleging a fraud or

mistake, . . . must state with particularity the circumstances constituting the fraud or mistake." Fed. R. Civ. P. 9(b). Significant to this case, however, "intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* The facts have been discussed at length in this memorandum opinion and do not bear repeating. The allegations that form the basis for the reformation count clearly meet the Rule 9(b) standard. In his amended complaint, Sumpter alleges the parties intended for Form CG 2504 11/85, which stated the limits of liability were per property, to be included in the 1995–1996 CGL policy, as it had in prior policies and the subsequent policy. Am. Compl. ¶ 125. Sumpter alleges Mankowitz was unaware that the per property endorsement was not added to the 1995–1996 policy after he received the broker's September 1995 letter notifying him that the omission would be corrected. *Id.* ¶¶ 44–47. He further alleges that Mankowitz and City Homes paid substantially the same premium as in other years when the per property endorsement was included. *See id.* ¶¶ 50, 128–29. These allegations satisfy Rule 9(b)'s heightened pleading standard. *See Johnson*, 447 F. Supp. 3d at 383 (finding that plaintiff's pleadings met the Rule 9(b) standard on similar facts and noting that in *Charter Oak*, 2011 WL 856374, at *15 the court "stat[ed] the complaint need not 'specifically describe instances wherein [the insurers] expressed their intentions with words' as the complaint 'still contains sufficient facts to support an inference that the parties held a common understanding of what the insurance contract was meant to encompass that was different from the understanding memorialized in the Policies'"). Accordingly, Sumpter has stated a claim for reformation.

b. *Laches*

The equitable doctrine of laches is an affirmative defense "against stale claims[] and is based upon grounds of sound public policy by discouraging fusty demands for the peace of society." *AC & R Insulation Co. v. Penn. Manufacturers' Ass'n Ins. Co.*, 993 F. Supp. 2d 539,

546 (D. Md. 2014) (quoting *Parker v. Bd. of Election Supervisors*, 186 A.2d 195, 197 (Md. 1962)).

Stated differently, laches "protect[s] a party from having to defend claims that are asserted so long

after they have accrued that it would be unjust to defendants." *Id.*  Pursuant to this doctrine, the

Court may dismiss a claim if the defendant demonstrates "both inexcusable delay and prejudice."

*Johnson*, 447 F. Supp. 3d at 381 (citing *Ross v. State Bd. of Elections*, 876 A.2d 692, 704 (Md.

2005)).

When considering Penn National's motion to dismiss in *Johnson*, the Court did "not find

that laches bar[red] Johnson's reformation claim," at least at that preliminary stage of the

proceeding.  *Id.*  Judge Blake reasoned:

> "[S]ince laches implies negligence in not asserting a right within a reasonable time
> after its discovery, a party must have had knowledge, or the means of knowledge,
> of the facts which created his cause of action in order for him to be guilty of laches."
> . . . [I]t appears that, although the broker informed City Homes (through
> Mankowitz) that the per location endorsement was not initially included, that same
> letter informed Mankowitz that the broker would fix the error, and Mankowitz
> therefore did not know the per location endorsement was not included until March
> 2019, when informed by Penn National. Further, the 95–96 policy was a renewal
> of the already-issued general liability policy, and each of the previous policies for
> 1991 through 1995 included the per location endorsement.

*Id.* (quoting *Parker*, 186 A.2d at 197; footnote and citations to compl. omitted).  The Court

distinguished Johnson's case from *AC & R Insulation Co.*, 993 F. Supp. 2d at 548–49, where "there

was evidence that the insured was aware of the exclusions at issue and the insurer had taken the

position it would not defend certain lawsuits because of the policy exclusions over twenty years

prior to the initiating of the reformation suit."  *Id.*  In contrast, Johnson's complaint alleged

"Mankowitz did not know that the omission of the per location endorsement was not corrected,"

and it did not "appear that Penn National had previously asserted that the per location endorsement

did not apply." *Johnson*, 447 F. Supp. 3d at 381–82.

Penn National argues that this Court should reach a different result than it did in *Johnson* because the facts are different. Def.'s Mem. 26–28. But the material allegations are the same. They include that the 1995–1996 CGL policy provided coverage for the approximately 278 properties owned by City Homes and Mankowitz. Am. Compl. ¶¶ 26–31, 44–45. City Homes and Mankowitz had insured the properties through Penn National since 1991, and each year after 1991, they obtained "what are known as 'renewal policies' – in other words, precisely the same policies as were issued for the previous year's policy period." *Id.* ¶ 45. The 1995–1996 CGL policy was the fifth in a series of six "renewal policies," and the other policies all incorporated a form stating that the $1 million limit was per property. *Id.* ¶¶ 35–36. Although the 1995–1996 CGL policy did not include the form, the insurance broker noted the omission in a September 29, 1995 letter and informed Mankowitz that "[e]ndorsements [would] be issued to correct [the omission]." *Id.* ¶¶ 46–47. The broker stated that the endorsements would "[a]dd the following liability forms or advise why they were not included: . . . CG 2504 11/85." *Id.* ¶ 47. The September 1995 letter quoted by Sumpter appears to be the same letter quoted in *Johnson*. A substantially equivalent endorsement was included the next year with the 1996–1997 CGL policy. *Id.* ¶¶ 37 & 53. The insureds did not learn from Penn National that the limit was not per property until March 2019, when Penn National informed them on March 13, 2019 that the 1995–1996 CGL policy had been exhausted, based on Penn National's belief it had an overall $1 million limit. *Id.* ¶¶ 65 & 67. Assuming these facts are true and construing them in Sumpter's favor, the Court finds that Penn National has not established that the doctrine of laches supports pre-discovery dismissal of plaintiff's reformation and declaratory judgment claims. *See Johnson*, 447 F. Supp. 3d at 381–82.

### c.   *Ratification, Waiver, and the Bankruptcy Plan*

Penn National argues that Sumpter's reformation and declaratory judgment claims must be dismissed "because City Homes either ratified the 1995-1996 policy terms as written or waived any claim it may have for reformation." Def.'s Mem. 29.  It also contends that the claim is "barred under the terms of the [Bankruptcy] Plan." *Id.* at 31.  Ratification is "[a] person's binding adoption of an act already completed but . . . not done in a way that originally produced a legal obligation." *Charter Oak Fire Ins. Co. v. Am. Capital, Ltd.*, No. DKC-09-100, 2011 WL 856374, at *14 (D. Md. Mar. 9, 2011) (quoting *Black's Law Dictionary* (8th ed. 2004)).  Waiver is "the voluntary relinquishment of a known right." *Id.* (quoting *Souter v. State Mut. Life Assurance Co.*, 273 F.2d 921, 925 n.6 (4th Cir. 1960)).  Ratification and waiver, like laches, are affirmative defenses. *Id.* at *16.  Therefore, Penn National "bear[s] the burden of showing that the facts necessary to establish the defense 'clearly appear on the face of the complaint.'" *Id.* (quoting *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007)).

None of the insureds' actions described in the amended complaint establish that they voluntarily accepted a policy with a $1 million limit for approximately 278 properties instead of a policy with a $1 million per property limit which they had purchased for four consecutive years and for which they paid substantially the same premium.  As discussed with regard to laches, plaintiff alleged the insureds relied on the September 1995 broker letter stating that the 1995–1996 CGL policy would be amended to include the endorsement that had been incorporated into the policy for each previous year beginning in 1991, and they had no reason to believe the 1995–1996 CGL policy did not include the endorsement until March 2019.

The insureds' agreement to the bankruptcy plan does not establish waiver or ratification or otherwise preclude the reformation and declaratory judgment claims.  At most it shows they agreed

that "all insurance policies, including but not limited to Lead-Paint Insurance Policies, shall remain in full force and effect unless otherwise validly terminated." Apr. 13, 2017 Order Confirming Bankr. Plan ¶ 13, ECF 31-6. Thus, the parties to the plan agreed to the terms they believed the policies included at the time, including the per property endorsement. In addition, the bankruptcy plan does not preclude legal or equitable claims relating to the insurance policies. It states, in relevant part:

> Nothing relating to this Plan, the Disclosure Statement, the confirmation of this Plan or the entry of the Confirmation Order shall be construed as a waiver or admission with respect to any Lead-Paint Claim and all parties (expressly including the Lead-Paint Insurance Entities) shall be free to make any contentions permitted by applicable bankruptcy and non-bankruptcy law with respect to such Lead Paint Claims.

Third Am. Ch. 11 Plan § 5.6(c). In subsection 5.6(g)(ii) of the bankruptcy plan, it provides that nothing in the plan or related documents will "have any *res judicata*, collateral estoppel or other preclusive effect on any party's legal, equitable or contractual rights and obligations under any Lead Paint Insurance Policy[.]" *Id.* § 5.6(g)(ii). As Judge Blake concluded, it "appears that the plan was not intended to modify any rights regarding the insurance policies, including equitable rights." *Johnson*, 447 F. Supp. 3d at 382. Penn National has not met its burden of showing either ratification or waiver, and the bankruptcy plan does not bar plaintiff's claims for reformation and a declaratory judgment. *See Charter Oak*, 2011 WL 856374, at *16; *Johnson*, 447 F. Supp. 3d at 382–83 (finding that the bankruptcy plan did not demonstrate that "the City Homes defendants . . . waived the right to bring a claim for reformation"). Defendant's motion is denied as to Counts III and IV of the amended complaint.

### 4. Counterclaim for Declaratory Judgment

Penn National alleges that, to the extent it is liable for the judgment in Sumpter's favor against its insureds, it "is not required to cover the entire judgment because it is not obligated to

indemnify its insured(s) for bodily injury to Sumpter that occurred before the policy period(s) for the period of time it covered the Property while Sumpter was living at the Property or after said time period." Countercl. ¶ 24. It insists that, under Maryland law, it "is contractually obligated to pay no more than that the portion of Sumpter's final judgment which represents Penn National's pro-rata time on the risk." *Id*. ¶ 23 (citing *Penn. Nat'l Mut. Cas. Ins. Co. v. Roberts*, 668 F.3d 106 (4th Cir. 2012); *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 802 A.2d 1070 (Md. Ct. Spec. App. 2002)). The *Roberts* Court observed that "[i]n lead paint or continuous trigger cases . . . , Maryland courts engage in a 'pro rata by time-on-the-risk allocation' of liability." 668 F.3d at 113. Penn National asks the Court to declare its "pro rata share based on its time on the risk considering the entire time period that Sumpter suffered and/or continued to suffer bodily injury from lead exposure." Countercl. 5.

Sumpter argues that the Court should dismiss the counterclaim because the time-on-the-risk analysis discussed in *Roberts* "has absolutely no relevance to . . . Count I – bad faith failure to settle within policy limits," an action that "lies in tort not in contract." Pl.'s Mem. 3. Plaintiff insists that "once the jury rendered a verdict the *Roberts* analysis became meaningless." *Id*. Stated differently, plaintiff argues that apportionment is inappropriate because Penn National will be liable for the entirety of the excess verdict under the bad faith failure to settle claim. He concedes, however, that apportionment under "*Roberts* may have some relevance as to Count II." *Id*.

This memorandum opinion and order dismisses without prejudice Plaintiff's claim for bad faith failure to settle. Therefore, insofar as Penn National may be liable for the judgment against its insureds, its liability would be based on breach of contract. Thus, it is appropriate for the Court to consider the extent of Penn National's liability under the policies. Plaintiff's motion to dismiss the counterclaim is denied.

III.     **Motion to Strike Jury Demand**

The Seventh Amendment provides a right to trial by jury for legal claims, such as breach of contract.  *See Topline Sols., Inc. v. Sandler Sys., Inc.*, 131 F. Supp. 3d 435, 438 n.9 (D. Md. 2015); U.S. Const. am. VII ("In Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved."); Fed. R. Civ. P. 38(a) ("The right of trial by jury as declared by the Seventh Amendment to the Constitution--or as provided by a federal statute--is preserved to the parties inviolate.").  Further, "[o]n any issue triable of right by a jury, a party may demand a jury trial."  Fed. R. Civ. P. 38(a).

Plaintiff has demanded a jury trial "of all issues so triable."  Am. Compl. 21.  Therefore, "the action must proceed as a jury trial 'unless . . . the [C]ourt, on motion or on its own, finds that on some or all of those issues there is no federal right to a jury trial.'" *Topline Sols.*, 131 F. Supp. 3d at 438 (quoting Fed. R. Civ. P. 39(a)(2)).  Plaintiff's claim for breach of contract survives Penn National's motion to strike plaintiff's jury demand.  The motion is denied without prejudice to renewal after summary judgment motions are decided, should Penn National have a good faith basis for renewing it.

## ORDER

For the reasons stated above, it is, this <u>30th</u> day of <u>November</u>, <u>2020</u>, hereby ORDERED that:

1.     Defendant's motion to dismiss plaintiff's amended complaint, ECF 31, IS GRANTED IN PART AND DENIED IN PART, as follows:

   a.   Plaintiff's claim for bad faith failure to settle is dismissed without prejudice;

   b.   Defendant's motion is denied as to plaintiff's claims for breach of contract, reformation, and a declaratory judgment;

2.     Plaintiff's motion to dismiss defendant's counterclaim, ECF 21, IS DENIED;

3.    Defendant's motion to strike plaintiff's jury demand, ECF 15, IS DENIED without

      prejudice; and

4.    The parties' answers are due December 15, 2020.


                                              _____/S/_____
                                              Deborah L. Boardman
                                              United States Magistrate Judge