IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| DILAN SUMPTER, | * |
|    Plaintiff, | * |
| v. | * |
| PENNSYLVANIA NATIONAL MUTUAL CASUALTY INSURANCE COMPANY, | *   Civil Case No.: 1:19-cv-03270-JMC |
| | * |
|    Defendant. | |
| | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

## I.   INTRODUCTION

Plaintiff Dilan Sumpter sustained injuries due to lead-based paint exposure while residing at several different properties in Baltimore, Maryland. (ECF No. 20 at 1). On June 4, 2019, a jury in the Circuit Court for Baltimore City returned a verdict in his favor for $1,725,936 based on the combined exposure. *Id.* at 2. The instant lawsuit relates to insurance coverage from Defendant, Pennsylvania National Mutual Casualty Insurance Company ("Penn National"), for the portion of damages he sustained between September 5, 1995 and August 1, 1997 while residing at a particular residential rental property owned and operated by City Homes, Inc. ("City Homes") and Barry Mankowitz ("Mankowitz"), representing 27% of Plaintiff's total lead exposure.[1] *Id.* at 1. In its substantive counts, this lawsuit focuses primarily on the amount of insurance coverage, if any, provided by Penn National for the subject property applicable to the 1995-96 policy year. *Id.* at 10-11. Pending before the Court is Defendant's Motion for Summary Judgment on Counts II and

---

[1] The Baltimore City action determined that Plaintiff had 1,215 total days of lead-based paint exposure from his time at all the various properties at which he resided, of which 329 days (or 27%) occurred during the time he resided at the property at issue. (ECF No. 53-1 at 16-19).

1

III and Motion to Dismiss Count IV (ECF No. 59). The Court has considered Plaintiff's Response in Opposition (ECF No. 70) and Defendant's Reply (ECF No. 72). Additionally pending is Plaintiff's Motion to Compel (ECF No. 71). In response, Defendant filed a Motion in Opposition (ECF No. 73) and Plaintiff filed a Reply (ECF No. 74). The issues are fully briefed, and no hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons explained below, Defendant's Motion for Summary Judgment (ECF No. 59) is GRANTED IN PART as to Count II and GRANTED IN FULL as to Counts III and IV. Consequently, Plaintiff's Motion to Compel (ECF No. 71) is DENIED as moot.

## II. BACKGROUND

Plaintiff, who is not a named insured under the policies at issue, nonetheless gained the ability to pursue rights under those policies by virtue of an assignment from the insured, City Homes, through the trustee after City Homes declared bankruptcy. (ECF No. 59-5). The assignment is explicitly not a general assignment of the policies themselves, but instead a limited transfer of rights to pursue Penn National for contractional and extra contractual damages to the extent Penn National failed to fulfill its policy obligations "in connection with [Plaintiff's] lead-based paint personal injury lawsuit" for the time he resided at the City Homes' property at issue. *Id.* That is, the assignment limited its grant of rights under the policies to those directly related to Plaintiff's lawsuit.

Beginning in 1991 and continuing until 1997, City Homes and Mankowitz purchased one-year commercial general liability ("CGL" or "general liability") and commercial umbrella insurance policies from Penn National for all of their residential rental properties in Baltimore, including the property at issue. (ECF No. 20 at 4-6). The portion of the lead-paint exposure from the property at issue (September 4, 1996 to August 1, 1997) therefore implicates both the 1995–

1996 and 1996–1997 CGL and umbrella insurance policies. *Id*. at 10. The instant coverage dispute specifically concerns the 1995-96 policies. *Id*. at 10-11.

Penn National initially contended that all of its applicable policies were exhausted and refused to pay any part of the Baltimore City judgment. (ECF No. 59, Ex. 1 at 6). Plaintiff countered that Penn National's interpretation of its 1995-1996 CGL and umbrella policies was incorrect, and that the collective $11 million limits from the 1995-1996 policies should be applied on a "per property" basis rather than applied to all the approximately 278 properties owned and operated by City Homes and Mankowitz. (ECF No. 20 at 5-8). Specifically, Plaintiff argued that the absence of a "per property" endorsement in the 1995-96 policy year was a mutual oversight between insurer and insured, as such an endorsement was present in all other policy years. *Id*.

In response to Plaintiff's original complaint in which Plaintiff sought coverage for the *entire* $1,725,936 judgment (despite residing at the subject property for only 27% of his total exposure time), Penn National filed, *inter alia*, a motion to dismiss and a counterclaim on January 21, 2020. (ECF Nos. 16 & 17). In the counterclaim, Penn National sought a declaratory judgment as follows:

> Under Maryland Law, which governs this claim, Penn National is contractually obligated to pay no more than that the portion of [Plaintiff's] final judgment which represents Penn National's pro-rata time on the risk. *Pennsylvania National Mutual Casualty Insurance Company v. Roberts*, 668 F.3d 106 (4th Cir. 2012) (applying Maryland law); *Mayor & City Council of Baltimore v. Utica Mut. Ins. Co.*, 145 Md. App. 256 (2002).
>
> Penn National is not required to cover the entire judgment because it is not obligated to indemnify its insured(s) for bodily injury to [Plaintiff] that occurred before the policy period(s) for the period of time it covered the Property while [Plaintiff] was living at the Property or after said time period. A time-on-risk analysis must be undertaken in order to determine the allocation of the amount of Penn National's liability under its policies for the judgment at issue.

(ECF No. 17 at 4-5).

3

Plaintiff filed an Amended Complaint (ECF No. 20) on February 25, 2020 wherein he asserted the following: a claim of bad faith failure to settle within the 1995–1996 and 1996–1997 CGL and commercial umbrella policy limits prior to verdict when the settlement demand was $400,000 (Count I); a claim for breach of contract based on Defendant's alleged breach of the 1995–1996 and 1996–1997 CGL and commercial umbrella policies (Count II); a claim for reformation of the 1995–1996 CGL policy to the per property endorsement based on mutual mistake (Count III); and a claim for a declaratory judgment that the per property endorsement applied to the 1995–1996 CGL policy (Count IV).  In response, Defendant renewed his Motion to Dismiss on May 22, 2020 (ECF No. 31).

On December 2, 2020, Judge Boardman of this Court granted Defendant's Motion to Dismiss in part, finding that Plaintiff had failed to state a claim for bad faith, and allowing only one of two breach of contract theories posited by Plaintiff to go forward.  (ECF No. 38).  In so doing, Judge Boardman stated:

> Sumpter's bad faith claim is predicated largely on Penn National's position that the per property endorsement was not part of the 1995–1996 policies. Am. Compl. ¶¶ 92–95. That central issue will be decided by the reformation claim. Thus, even if the bad faith claim had been properly pled, the Court would have stayed the claim because it would be more efficient to decide the other pending claims first. Should discovery regarding the reformation claim, or its ultimate resolution, provide plaintiff with sufficient facts to state a claim for bad faith failure to settle, the Court will entertain a motion to amend at that time. Because Sumpter has failed to state a claim for bad faith failure to settle, Count I is dismissed without prejudice.

*Id*. at 15.  As for the surviving breach of contact theory, Judge Boardman held that if, as Plaintiff alleged, the policies at issue were not exhausted yet Penn National refused to honor its policy obligations, the Amended Complaint stated a claim for breach of contract.  *Id*. at 18, 19.  Judge Boardman also denied Penn National's Motion with regards to Counts III and IV.

On February 25, 2021, Penn National moved for summary judgment on its counterclaim, seeking a declaration that its indemnity obligation was limited to its "time on risk." (ECF No. 53). Penn National relied on the principle first announced in *Mayor and City Council of Baltimore v. Utica Mut. Ins. Co.,* 145 Md. App. 256 (2002), that "[e]ach insurer is liable for the period of time it was on the risk compared to the entire period during which damages occurred." *Id.* at 314. By Penn National's calculation, this limited its potential policy obligations to 329 days, representing 27% of Plaintiff's 1,215-day lead exposure as determined in the underlying tort case and, correspondingly 27% of the $1,725,936 jury verdict obtained by Plaintiff in that case. (ECF No. 53, Ex. 1 at 16-19). Plaintiff did not oppose Penn National's Motion (ECF No. 54), and Judge Boardman therefore ordered "that Penn National is obligated to indemnify its insured for 27.0% of the $1,725,936.00 underlying judgment in the Baltimore City Circuit Court action *Sumpter v. City Homes, Inc., et al*, Case No. 24-C17-002383." (ECF No. 55). Thus, Penn National's indemnity obligations pursuant to the policies at issue have been previously decided by this Court.

Such ruling, of course, did not address the central contention of this lawsuit—whether coverage had already been exhausted under the 1995-96 policy such that Penn National would have no further obligation to pay notwithstanding its attributed 27% allocation. As summarized by Penn National:

> Penn National asserts that the 1995-1996 policy has been exhausted. Plaintiff, on the other hand, contends that the polic(ies) for this time period should be reformed so as to extend coverage. If Penn National's position as to reformation is ultimately determined to be correct, then the insured would be responsible for the allocated amount for this twenty-seven day period.[2] If, on the other hand, the Plaintiff's position with respect to reformation is determined to be correct, then Penn National would be responsible for the allocated amount for this twenty-seven day period.

---

[2] Of the 329 total days when Penn National was "on the risk," 27 of those days were within the 1995-96 policy period, with the remaining 302 days being in the 1996-97 policy period. Penn National does not argue that there is insufficient remaining coverage under the 1996-97 policies to satisfy its indemnity obligation for those 302 days, as those policies *did* include the per property endorsement.

5

(ECF 53, Ex. 1 at 9-10).

Importantly, however, Penn National went a step further:

> [T]he allocation attributable to this twenty-seven day period is relatively miniscule in light of the overall issues relating to allocation. So as to prevent this period from being the tail wagging the dog on issues of allocation, Penn National, for purposes of this case only, will pay any amount attributed to this twenty-seven day period, regardless of whether the allocation should actually be the responsibility of the insured.

*Id.* That is, notwithstanding the parties' dispute as to whether the per property endorsement applies to the 1995-96 policies, Penn National has agreed (for purposes of this case only) to pay the full amount of its policy obligation applicable to the 27-day period attributable to the 1995-96 policies, along with the 302-day period applicable to the 1996-97 policies (for which Penn National does not contend coverage has been exhausted due to the per property endorsement included with those later policies). *Id.* Plaintiff does not dispute this calculation. (ECF No. 70 at 3).

Subsequently, on May 12, 2021, Penn National tendered, and Plaintiff accepted, payment in the amount of $556,395.50, representing Penn National's full indemnity obligation for the judgment rendered in the underlying lawsuit, including the full amount for its time on risk attributable to the 1995-96 policies, plus interest[3] on that amount running from the date of judgment to the date of payment. (ECF No. 59, Ex. 2).

As a result, Penn National argues in its present Motion for Summary Judgment and to Dismiss that there is no longer a case or controversy before this Court, rendering Plaintiff's case moot. As set forth more fully below, the Court largely agrees, with the exception of one minor

---

[3] As will be discussed in more detail, Plaintiff disputes that this interest calculation is correct, and instead argues that the policies call for the payment of interest for the entire judgment, not just on that amount attributed to Penn National's time on risk. (ECF No. 70 at 5.)

issue. The Court will GRANT IN PART Defendant's Motion as to Count II, GRANT IN FULL Defendant's Motion as to Counts III and IV, and DENY Plaintiff's related Motion to Compel.

### III. LEGAL STANDARD

Primarily arguing mootness, Penn National has moved for summary judgment, or alternatively, to dismiss Count II, summary judgment as to Count III, and to dismiss Count IV. As a preliminary matter, the Court must decide the appropriate legal standard to apply.

Issues of mootness are properly the subject of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction as the doctrine "constitutes a part of the constitutional limits of federal court jurisdiction." *Simmons v. United Mortg. & Loan Inv., LLC*, 634 F.3d 754, 763 (4th Cir. 2011) (quoting *United States v. Hardy*, 545 F.3d 280, 283 (4th Cir. 2008)). In determining whether jurisdiction exists, the district court is to regard the pleadings' allegations as mere evidence on the issue, and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment. *Trentacosta v. Frontier Pacific Aircraft Indus.,* 813 F.2d 1553, 1558 (9th Cir.1987). The district court, however, should apply the standard applicable to a motion for summary judgment, under which the nonmoving party must set forth specific facts beyond the pleadings to show that a genuine issue of material fact exists. *Richmond, Fredericksburg & Potomac R. Co. v. U.S.*, 945 F.2d 765, 768 (4th Cir. 1991) (internal citations omitted); *see also Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004)). The moving party should prevail only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law. *Trentacosta*, 813 F.2d at 1558.

**IV.    ANALYSIS**

  *a. <u>Counts III and IV Are Moot and Must Be Dismissed</u>*

A federal court's jurisdiction over a case depends on the existence of an actual controversy between the parties "at all stages of review." *Arizonans for Official English v. Arizona*, 520 U.S. 43, 67, 117 S.Ct. 1055, 137 L.Ed.2d 170 (1997).  "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," *Porter v. Clarke*, 852 F.3d 358, 363 (4th Cir. 2017) (citations omitted), or, in other words, when the court's "resolution of an issue could not possibly have any practical effect on the outcome of the matter." *Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 161 (4th Cir. 2010).  Stated otherwise, "[i]f nothing further would be ordered by the court, there is no point in proceeding to decide the merits." *W. Virginia Highlands Conservancy v. Norton,* 161 F.Supp.2d 676, 679 (S.D.W.Va. 2001) (citing 13A *Federal Practice and Procedure* § 3533.2).  In *Arizona Christian Sch. Tuition Org. v. Winn*, the Supreme Court addressed the fundamental issue at stake as follows: "[c]ontinued adherence to the case-or-controversy requirement of Article III maintains the public's confidence in an unelected but restrained Federal Judiciary.... [f]or the federal courts to decide questions of law arising outside of cases and controversies would be inimical to the Constitution's democratic character." 563 U.S. 125, 133 (2011).

  Applying these principles first to Count III and Count IV, the Court readily concludes that both counts are now moot and must be dismissed.  Count III—Reformation—seeks to use the equitable doctrine of reformation to re-form the 1995-96 policies to include the per property endorsement, the omission of which Plaintiff contends was a mutual mistake.  However, Plaintiff has now recovered the benefit of the policies to the full extent of its assigned rights because Penn National *has now paid* its full indemnity obligation as previously determined by this Court

(without any opposition from Plaintiff) attributable to the 1995-96 policies. Where a claimant "receives the relief he or she sought to obtain through the claim," a case or controversy no longer exists due to mootness. *See Simmons*, 634 F.3d at 763.

Count IV—Declaratory Judgment—meets a similar fate, as Plaintiff is again seeking a determination by this Court that the 1995-96 policies should read as containing a per property endorsement. Re-couching this argument as a declaratory judgment does not avoid the same mootness concerns as in Count III. When a party files an action for declaratory judgment under 28 U.S.C. § 2201(a), which specifically incorporates Article III of the U.S. Constitution's "case or controversy" requirement, the district court has subject matter jurisdiction so long as an actual controversy exists. *Samsung Electronics Co., Ltd. v. Rambus, Inc.*, 398 F. Supp.2d 470, 475-76 (E.D.Va. 2005) (citing *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855 (Fed. Cir. 1999). When no controversy exists, a federal court has neither the power to render advisory opinions nor "to decide questions that cannot affect the rights of litigants in the case before them." *Id.* (citing *Preiser v. Newkirk*, 422 U.S. 395, 402, 95 S.Ct. 2330, 45 L.Ed.2d 272 (1975)). Where, as here, "intervening factual or legal events effectively dispel the case or controversy during pendency of the suit, the federal courts are powerless to decide the questions presented." *Id.* In such case, "[t]he mootness doctrine requires that the plaintiff's controversy remain live throughout the litigation; once the controversy ceases to exist, the court must dismiss the cause for want of jurisdiction." *Id*.

Plaintiff resists Penn National's Motion chiefly by invoking FRCP 56(d) and arguing that Plaintiff should be given the opportunity to conduct additional discovery. (ECF No. 70). In support, Plaintiff's counsel submitted an affidavit limited to Count III of the Amended Complaint–Reformation. (ECF No. 70-2 at 1). Plaintiff also incorporates by reference his Motion to Compel

9

which seeks specific discovery aimed at establishing that the per property endorsement applies to the 1995-96 policies. (ECF No. 70 at 2; ECF No. 70, Ex. 2 at 1). As noted above, however, that issue is now moot given that Penn National has paid (and Plaintiff has accepted) its full indemnity obligation *just as if* the per property endorsement was applicable. Plaintiff therefore could not recover any greater amount by successfully arguing that the policies should be reformed or that this Court declare the per property endorsement applicable to the policies in question. Similarly, Plaintiff's previously-dismissed Bad Faith claim does not justify a discovery continuance under issues that are moot solely for the possibility that newly-discovered evidence could perhaps support a theory which was previously deemed as insufficiently pled. This would run afoul of FRCP 26(b)(1), limiting discovery to that which is relevant to a party's claim or defense, given that Bad Faith is currently not a claim and the Reformation count is moot. Stated otherwise, the Court cannot justify discovery on an absent claim or a moot count in the hopes that such discovery may revive a previously-dismissed count.[4]

Finally, although Plaintiff's Amended Complaint and his arguments opposing the instant Motion seem to contemplate that the Court, in addition to determining Plaintiff's assigned rights, also make a determination of coverage "for every *other* claim under the policy arising out of separate locations", (ECF 20 at 21) such a determination greatly exceeds the scope of Plaintiff's original assignment of rights and, as such, exceeds Plaintiff's standing to request such relief as a way of saving his own claim from dismissal for mootness. As noted by Defendants, Plaintiff "was not entitled, as assignee, to act as a roving ambassador of equity seeking reformation of a contract

---

[4] It is true that Judge Boardman dismissed the Bad Faith count without prejudice, positing that discovery on Count III—Reformation—might uncover information regarding the per property endorsement that could be used to support a Motion to Amend. (ECF No. 38 at 15). Such ruling does not negate Judge Boardman's other finding that the Bad Faith count was insufficiently pled beyond whether the per property endorsement applied. *Id*. at 12-14.

when: (1) he, himself, has received, by virtue of this Court's order(s), a determination of the indemnity he is to be paid by Penn National; and (2) that indemnity amount has been paid by Penn National." (ECF 59, Ex. 1 at 20).

Because Defendant has now paid its full indemnity obligation as previously determined by this Court (and without any opposition from Plaintiff), this Court declines to exercise further jurisdiction to render what would effectively be an advisory opinion as to Counts III and IV.

    b. *Count II Remains Justiciable in Part*

This leaves Count II—Breach of Contract—as the remaining claim in Plaintiff's Amended Complaint. Penn National contends that, like Counts III and IV, Plaintiff has been paid the full indemnity benefit provided under *Plaintiff's* reading of 1995-96 policies, entitling Penn National to judgment or dismissal or, alternatively, entitling Plaintiff to a judgment of $0. (ECF No. 59, Ex. 1 at 10). In his opposition, Plaintiff does not argue to the contrary, but asserts that he is entitled to interest accounting for the time that the Baltimore City's underlying judgment remained unpaid. Although Penn National paid interest on its full indemnity obligation based on its time on risk, Plaintiff argues that the policies' "interest" provisions entitle him to interest on the entire $1,725,936. Specifically, Plaintiff argues:

> All of the Policies Penn National issued to City Homes contained the Commercial General Liability Coverage Form. (ECF No. 70 at 4-5; ECF No. 70, Exhibit 1)….In a section entitled "SUPPLEMENTARY PAYMENTS – COVERAGES A AND B," the Form contains the following language regarding interest:
>
> 7. All interest on the full amount of any judgment that accrues after entry of the judgment and before we have paid, offered to pay, or deposited in court the part of the judgment that is within the applicable limit of insurance.

(ECF No. 70 at 4-5; ECF No. 70-1 at 6). Plaintiff points out that in *Pennsylvania National Mutual Casualty Insurance Company v. Jeffers*, 244 Md. App. 471 (2020), the Maryland Court of Special

11

Appeals examined the same interest language in an identical Penn National policy. *Id* at 498-508. The Court found that Penn National was obligated to pay "[all] interest on the full amount of any judgment." *Id.* at 503. Thus, Plaintiff argues that Penn National now must pay interest on the entire judgment from the date of its entry in the underlying tort case (June 6, 2019) until the date of payment, less the $90,391.78 it has already paid on its time on risk allocation of the judgment. (ECF No. 70 at 4-5).

It is not exactly clear what Penn National's position is in response. First, Penn National concedes that the "SUPPLEMENTARY PAYMENTS" language quoted above is applicable to the 1995-96 policies. (ECF No. 72 at 5-6). However, Penn National stops short of conceding that Plaintiff's interpretation of *Jeffers* is controlling. Instead, Penn National argues:

> The only dispute that may exist with respect to the interest issue is whether Penn National agrees with Plaintiff's *calculation* as to the amount of interest he contends is still owed. Penn National is unable to definitively address whether such a dispute exists, however, because Plaintiff has not suggested a proposed interest calculation.

*Id*. (emphasis added). Further, Penn National, in a footnote, states that it does not dispute the "*method of calculation*" of interest set forth in *Jeffers*. *Id*. at 5, n.7 (emphasis added). But not disputing the *method of calculation* could simply mean that Penn National does not dispute the interest rate itself or that interest runs from the date of the Baltimore City judgment to the date of payment. Penn National's stance falls short of establishing that there is no dispute as to whether interest is owed on the full amount of the judgment, or whether interest is owed on just Penn National's pro rata share of the judgment based on its time on risk.

Accordingly, although the Court finds that Penn National has paid its indemnity under the policies at issue so as to moot that portion of Plaintiff's Breach of Contract claim seeking same, the Court further finds that the sole remaining issue in this case to be resolved is whether the

interest due is based on the total amount of the Baltimore City judgment or only that portion attributable to Penn National's time on risk, and, if the former, what amount of unpaid interest remains after crediting the interest Penn National has already paid.

As guidance to the parties, because Penn National has not put before the Court any authority to suggest that *Jeffers* should not be followed, it is the Court's view at this juncture that the interest due should be based on the full amount of the Baltimore City judgment. Thus, the parties might best devote their energies to trying to agree on the amount of remaining interest owed after crediting Penn National on the interest it has already paid. If the parties can reach a stipulation as to this amount, the Court is prepared to enter a judgment for that amount in Plaintiff's favor, fully disposing of this action. Alternatively, if Penn National has authority to support an argument that, as a matter of law, interest should only be due and owing on its pro rata share based on its time on risk, Penn National is free to make that argument, but should do so within fifteen (15) days of this Memorandum and Order. This remaining issue regarding interest prevents a full dismissal or entry of judgment as to Count II at this time.

For the reasons discussed above, Defendant's Motion (ECF No. 59) is **GRANTED IN PART** and **DENIED IN PART** as to Count II, and **GRANTED** as to Counts III and IV. Finally, given the rulings above, Plaintiff's Motion to Compel (ECF No. 71) is **DENIED** as moot.

_____/s/_____
J. Mark Coulson
United States Magistrate Judge
Dated: October 8, 2021